ORIGINAL

1  ROSMAN & GERMAIN LLP
2  Daniel L. Germain (Bar No. 143334)
   16311 Ventura Boulevard
   Suite 1200
3  Encino, CA  91436-2152
   Telephone: (818) 788-0877
4  Facsimile: (818) 788-0885

5  SCHIFFRIN BARROWAY
6  TOPAZ & KESSLER, LLP
   Eric L. Zagar (Bar No. 250519)
   Nichole Browning (Bar No. 251937)
7  Tara P. Kao
   280 King of Prussia Road
8  Radnor, PA  19087
   Telephone: 610-667-7706
9  Facsimile: (610) 667-7056

10  Attorneys for Plaintiff

11

           **UNITED STATES DISTRICT COURT**
12
          **CENTRAL DISTRICT OF CALIFORNIA**
13

14  SUSAN LACERENZA, Derivatively on       Case No. 07-07141 DDP (AJWx)
    Behalf of Nominal Defendant
15  VALUECLICK, INC.,
                                           **VERIFIED FIRST AMENDED**
16                            Plaintiff,   **DERIVATIVE COMPLAINT**

17             v.

18  JAMES R. ZARLEY, DAVID S.
    BUZBY, MARTIN T. HART, JEFFREY
19  F. RAYPORT, TOM A. VADNAIS,
    SCOTT P. BARLOW, JOSH GRAY,            **JURY TRIAL DEMANDED**
20  SAMUEL J. PAISLEY, G. SCOTT
    PIOTROSKI, SCOTT H. RAY, CARL J.
21  WHITE, PETER J. WOLFERT,

22                            Defendants,

23             and

24  VALUECLICK, INC.

25                    Nominal Defendant.

26

27

28

VERIFIED FIRST AMENDED DERIVATIVE COMPLAINT

Plaintiff, Susan Lacerenza, by the undersigned attorneys, submits this Verified Amended Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of nominal defendant ValueClick, Inc. ("ValueClick" or the "Company") against the members of its Board of Directors (the "Board") and certain executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment and insider trading.

2.      The Individual Defendants (defined herein) breached their fiduciary duties by causing the Company to engage in illegal and deceptive practices with respect to its lead generation business, which resulted in an investigation by the Federal Trade Commission ("FTC") of possible violations of the Federal Trade Commission Act and the CAN-SPAM Act.[1]

---

[1] Section 5(a) of the Federal Trade Commission Action, 15 U.S.C. §45(a), states that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." An offer by a seller of a gift or "free" goods has been held to constitute an unfair or deceptive practice within the meaning of § 5(a) of the Federal Trade Commission Act where it appeared that the alleged gift or "free" goods were tied up with the purchase of another article and the price charged for such article was more than its usual and customary price.

As stated by the FTC,

The CAN-SPAM Act of 2003 (Controlling the Assault of Non-Solicited Pornography and Marketing Act) establishes requirements for those who send commercial email, spells out penalties for spammers and companies whose products are advertised in spam if they violate the law, and gives consumers the right to ask emailers to stop spamming them. The law, which became effective January 1, 2004, covers email whose primary purpose is advertising or promoting a commercial product or service, including content on a Web site. A "transactional or relationship message" — email that facilitates an agreed-upon transaction or updates a customer in an existing business relationship — may not contain false or misleading routing information, but otherwise is exempt from most provisions of the CAN-SPAM Act.

The CAN-SPAM Act, among other things, prohibits false and misleading header information on emails and deceptive subject lines and requires an opt-out method for email recipients.

3.     Specifically, in order to obtain leads[2] to sell to its customers, the Company, as the Individual Defendants knew, used false and misleading advertisements that promised "free" gifts that unlawfully required purchases of the advertised products and offered entry into contests for extravagant prizes that were never awarded.  The Individual Defendants knew that their lead generation activities were illegal and unsustainable.

4.     ValueClick's lead generation business accounted for a significant portion of the Company's revenues.  However, the lead generation business was inflated by the Individual Defendants' unlawful and illegal marketing and advertising campaigns.  These practices included, among other things, misleading "pop-up" ads which promised consumers a "free" gift of substantial value in order to induce them to submit their personal information, such as their name, contact information and e-mail address.  However, rather than provide the "free" gifts as advertised, the customers were actually required to purchase the advertised products, which violates FTC guidelines.   In addition, the Company also ran sham "sweepstakes" designed to obtain personal information from consumers that would be re-sold to ValueClick's customers.

5.     Defendants engaged in these unlawful marketing practices in order to create the impression that the Company was profitable and growing.  The Individual Defendants concealed these illegal marketing and advertising practices and the material impact they had on the Company's revenue and growth not only from customers but ValueClick's shareholders, and falsely portrayed the Company's actual performance.  The Individual Defendants also knowingly disseminated false and misleading financial statements, representing that, quarter after quarter, the

---

[2] A "lead" is a potential sales contact, such as an individual or organization that expresses an interest in a company's goods or services.  A lead typically includes names, email addresses and other contact information and can be obtained through a direct response to advertising.  ValueClick's lead generation business generated and sold leads to its customers.

Company's financial results had exceeded expectations and that the guidance for the fiscal year would be raised.   As a result of the false financial statements, ValueClick's stock rose precipitously.  The Individual Defendants knowingly failed to disclose that ValueClick's stellar financial performance was due in large part to illegal practices, which when halted would adversely impact ValueClick's lead-generation business, and in turn, its revenues and profits.

6.   On May 18, 2007, ValueClick's marketing practices came under scrutiny when the Company announced that the FTC was conducting an inquiry to determine if the Company's practices violated the FTC Act or the CAN-SPAM Act of 2003.

7.   As a result of the FTC's inquiry into the Company's marketing tactics, the Individual Defendants' improper practices finally fell apart, and on July 30, 2007 and October 16, 2007, the Company announced that its financial results fell below expectations and thereafter decreased its guidance for the fiscal year.

8.   Furthermore, based on their knowledge of material non-public information regarding their misconduct and unlawful marketing scams, certain defendants sold hundreds of thousands of shares of ValueClick common stock at artificially high prices, collectively garnering over *$35 million* in proceeds from November 2006 to October 2007.

## JURISDICTION AND VENUE

9.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).   This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.   Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary

participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

11.     Plaintiff Susan Lacerenza was a shareholder of nominal defendant ValueClick at the time of the wrongdoing alleged herein and has been a shareholder of ValueClick continuously since that time.  Lacerenza is a citizen of the State of Florida.

12.     Nominal defendant ValueClick is a Delaware corporation with its principal executive offices located at 30699 Russell Ranch Drive, Suite 250, Westlake Village, California 91362.  According to its public filings, ValueClick is an online marketing services company that sells targeted and measurable online advertising campaigns and programs for advertisers and advertising agency customers, generating qualified customer leads, online sales and increased brand recognition on their behalf with large numbers of online consumers.  At all relevant times, ValueClick had over 500 shareholders of record.

13.     Defendant James R. Zarley ("Zarley") has served as ValueClick's Executive Chairman of the Board since May 2007 and previously served as Chief Executive Officer ("CEO") and Chairman of the Board from 1999 to May 2007.  Upon information and belief, Zarley is a citizen of the State of California.

14.     Defendant David S. Buzby ("Buzby") has served as a director of ValueClick since May 1999 and has served on the Audit Committee of the Board (the "Audit Committee") since at least 2001.  Upon information and belief, Buzby is a citizen of the State of California.

15.     Defendant Martin T. Hart ("Hart") has served as a director of ValueClick since March 1999 and has served on the Audit Committee since at least 2001.  Upon information and belief, Hart is a citizen of the State of Colorado.

16.     Defendant Jeffrey F. Rayport ("Rayport") has served as a director of ValueClick since May 2002.  Upon information and belief, Rayport is a citizen of the Commonwealth of Massachusetts.

17.     Defendant Tom A. Vadnais ("Vadnais") has served as ValueClick's CEO since May 2007 and as a member of ValueClick's Board since October 2001. Vadnais previously held general manager roles for the Company's Mediaplex technology and Commission Junction affiliate marketing businesses and served as the president of ValueClick's U.S. operations from June 2006 to May 2007.  Upon information and belief, Vadnais is a citizen of the State of California.

18.     Defendant Scott P. Barlow ("Barlow") has served as ValueClick's Vice President and General Counsel since 2001 and as the Company's Secretary since 2002.  Upon information and belief, Barlow is a citizen of the State of California.

19.     Defendant Josh Gray ("Gray") was the CEO of Web Marketing Holdings, Inc. ("Webclients"), a company acquired by ValueClick in June 2005, and joined ValueClick's senior management team and continues to lead the Webclients business.  Upon information and belief, Gray is a citizen of the State of California.

20.     Defendant Samuel J. Paisley ("Paisley") has served as the Company's Chief Administrative Officer since 2000.  Upon information and belief, Paisley is a citizen of the State of California.

21.     Defendant G. Scott Piotroski ("Piotroski") is currently the General Manager of ValueClick Media's Lead Generation Network and was the Vice President of Operations of Webclients before the acquisition.  Upon information and belief, Piotroski is a citizen of the State of California.

22.     Defendant Scott H. Ray ("Ray") served as the Company's Chief Financial Officer ("CFO") from May 2005 to September 2007.  He also served as ValueClick's Executive Vice President of Finance from August 2004 to May 2005 and as the General Manager of the Company's Mediaplex division from November

1    2002 to August 2004.  Upon information and belief, Ray is a citizen of the State of

2    California.

3       23.    Defendant Carl J. White ("White") has served as CEO (Europe) of the

4    Company since August 2006.  White previously served as ValueClick's Chief

5    Operating Officer (Europe) from June 2005 to August 2006 and as the General

6    Manager of ValueClick's European operations from October 2001 to June 2005.

7    Upon information and belief, White is a citizen of the State of California.

8       24.    Defendant Peter J. Wolfert has served as ValueClick's Chief

9    Technology Officer since June 2000.  Upon information and belief, Wolfert is a

10   citizen of the State of California.

11      25.    Collectively, defendants Zarley, Buzby, Hart, Rayport, Vadnais,

12   Barlow, Gray, Paisley, Piotroski, Ray, White and Wolfert will be referred to herein

13   as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

15      26.    By reason of their positions as officers, directors, and/or fiduciaries of

16   ValueClick and because of their ability to control the business and corporate affairs

17   of ValueClick, the Individual Defendants owed ValueClick and its shareholders

18   fiduciary obligations of good faith, loyalty, and candor, and were and are required to

19   use their utmost ability to control and manage ValueClick in a fair, just, honest, and

20   equitable manner.  The Individual Defendants were and are required to act in

21   furtherance of the best interests of ValueClick and its shareholders so as to benefit all

22   shareholders equally and not in furtherance of their personal interest or benefit.  Each

23   director and officer of the Company owes to ValueClick and its shareholders the

24   fiduciary duty to exercise good faith and diligence in the administration of the affairs

25   of the Company and in the use and preservation of its property and assets, and the

26   highest obligations of fair dealing.

27      27.    The Individual Defendants, because of their positions of control and

28   authority as directors and/or officers of ValueClick, were able to and did, directly

and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with ValueClick, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

28.     To discharge their duties, the officers and directors of ValueClick were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of ValueClick were required to, among other things:

a.     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.     exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

d.     refrain from acting upon material inside corporate information to benefit themselves.

29.     The Individual Defendants, particularly Ray, the then-current CFO, and Audit Committee members Buzby and Hart, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.

30.     According to the Audit Committee Charter, the Audit Committee (comprised of Buzby and Hart) have the responsibility, among other things, to:

a.     Review and discuss with management and the outside auditor the Corporation's annual audited and quarterly unaudited financial statements, including: (a) an analysis of the auditor's judgment as to the quality of the Corporation's accounting principles, setting forth significant financial

reporting issues and judgments made in connection with the preparation of the financial statements; (b) the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," including the development, selection and reporting of accounting policies that may be regarded as critical; and (c) major issues regarding the Corporation's accounting principles and financial statement presentations, including any significant changes in the Corporation's selection or application of accounting principles and financial statement presentations. In addition, the Committee shall receive reports from the outside auditor as required by the rules of the Securities and Exchange Commission.

b.    Recommend to the Board, based on the review and discussion . . . , whether the financial statements should be included in the Annual Report on Form 10-K.

c.    Review earnings press releases, and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies. The chair of the Committee may represent the entire Committee for purposes of this review.

## FACTUAL ALLEGATIONS

### The Individual Defendant's Illegal Practices in Connection with the Company's Lead Generation Business

31.    In June 2005, ValueClick acquired Webclients, a performance-based marketing services company that generates leads for advertisers through its own online content, affiliate network and opt-in email database, in order to boost its lead generation business. In a June 13, 2005 press release announcing the acquisition, ValueClick claimed that "Web Clients will give ValueClick immediate scale in promotional and industry-focused online content and will expand the Company's existing lead-generation and opt-in email channels. Web Clients' websites complement ValueClick's Media, Commission Junction, Hi-Speed Media, Search123, and Pricerunner businesses, and can be leveraged across the Company's online marketing services portfolio and advertiser base." Webclient's CEO, Gray, and its Vice President of Operations, Piotroski, joined ValueClick's senior

1    management team following the merger and continue to lead the Webclients
2    business. Defendants Gray and Piotroski report directly to defendant Zarley.

3        32.    The acquisition of Webclients substantially boosted ValueClick's
4    revenues. In a Form 10-K filed with the U.S. Securities and Exchange Commission
5    ("SEC") on March 31, 2006, the Company disclosed that "[m]edia segment revenue
6    increased to $210.6 million for the year ended December 31, 2005 compared to
7    $93.3 million for 2004. The increase of $117.3 million, or 125.7%, in Media segment
8    revenue was primarily attributable to the acquisitions of Pricerunner in August 2004,
9    E-Babylon in June 2005, Webclients in June 2005, and Fastclick in September 2005,
10   accounting for $86.6 million of the increase."

11       33.    Subsequently, in a Form 10-K filed with the SEC on March 1, 2007, the
12   Company stated that "[m]edia segment revenue increased to $383.0 million for the
13   year ended December 31, 2006 compared to $164.8 million for 2005. The increase of
14   $218.1 million, or 132.3%, in Media segment revenue was primarily attributable to
15   the acquisitions of E-Babylon in June 2005, Webclients in June 2005, and Fastclick
16   in September 2005, and growth in our other U.S. and European media operations. As
17   a result of the integration activities related to these acquisitions, we are unable to
18   quantify the revenue directly attributable to these acquired businesses for the year
19   ended December 31, 2006."

20       34.    In a Form 8-K filed on May 22, 2007, "ValueClick stated that lead
21   generation accounted for more than 60 percent of its Media segment revenue for the
22   quarter ended March 31, 2007. In addition, the Company stated that the promotion-
23   based sub-category of lead generation, which is the subject of the FTC inquiry,
24   accounted for less than 30 percent of its Media segment revenue for the quarter
25   ended March 31, 2007."

26       35.    Since the acquisition of Webclients, the Individual Defendants caused
27   ValueClick to engage in illicit marketing practices to generate leads to sell to its
28   customers.    These practices are common knowledge within Webclients and

1  ValueClick, and the Board (defendants Zarley, Buzby, Hart, Rayport and Vadnais)

2  knew of these illegal practices.

3  **Bogus Contests**

4       36.    A part of ValueClick's business was its "sweepstakes" campaigns that

5  offered a chance at winning extravagant prizes, which included a Ford F-150 pick-up

6  truck, a Hummer, and college scholarship.  Users could enter these sweepstakes by

7  filling out online forms, thus providing their names, addresses and email addresses.

8  ValueClick received at least several hundred thousand entries through these

9  campaigns, information they sold to their customers.

10       37.    However, as directed by the Individual Defendants, the sweepstakes

11  campaigns were bogus because no drawings for the winner were ever held and no

12  procedures to select a winner were in place.  The prizes that were presented in the

13  contests were never even acquired for a winner.  Instead, once the entrant's

14  information was obtained, the sweepstakes forms were thrown away and discarded.

15  Users were left in the dark, thinking that someone else had won the prize.

16       38.    In addition, sometimes the Individual Defendants would move the cut-

17  off date for entries indefinitely so that contests have no ending and no drawings

18  would have to take place.  Examples of these perpetual contests are Remodel4Free,

19  Direct   Scholar,   Lenders   Avenue,   College   Information   Direct   and

20  ConsumerOpinionGroup.

21       39.    The bogus contests were conceived and directed by the top managers of

22  WebClients, defendants Gray and Piotroski, with the assistance of two of

23  ValueClick's in-house attorneys, Alex Hartzer ("Hartzer") and Shannon Gierasch

24  ("Gierasch").

25  **Disregarding Opt-Out Requests**

26       40.    After users provide their personal information to ValueClick, there is no

27  way for them to opt-out of the advertising campaigns, as required by the FTC.

28  Although consumers attempt to unsubscribe, the Individual Defendants refuse to

honor explicit requests by users to opt-out.   Although a list of unsubscribed consumers is gathered, the Individual Defendants do not delete those names from, or "scrub," ValueClick's emailing lists for ongoing email advertising campaigns. Remarkably, the Individual Defendants had not even implemented a procedure to unsubscribe users who explicitly request to be excluded from further contact.

41.   Instead, these users' information continued to be sold as leads to ValueClick's customers and used for a variety of other advertising promotions, forcing the user to have to separately attempt to opt-out of those new promotions. Basically, it was impossible for a consumer to opt-out of any advertising campaign and stop further solicitation.

42.   ValueClick's management was well aware of this illegal conduct. Indeed, management received several complaints regarding non-compliance in connection with the Company's refusal to honor opt-out requests, which were duly ignored. It was specifically raised with defendants Gray and Piotroski, who reported directly to Zarley, as well as Legal Affairs Manager Gierasch.   Defendants Gray, Piotroski and Gierasch disregarded the complaints because the Company made more money by not scrubbing its emailing lists and not reporting them to its customers. The Webclients division was essentially a data collection agency, which collected large volumes of consumer data to sell to as many of its customers as possible.

**Promise of "free" gifts**

43.   The Individual Defendants also engaged in marketing scams that promised "free" gifts that illegally required one or more purchases of the advertised products.   These "free" gift advertisements were a way to lure consumers to provide their personal information, such as home addresses, phone numbers and email addresses.

44.   ValueClick's advertisements provided that if consumers simply provide their personal information or complete a survey, they would receive a "free" product such as flat screen televisions, iPods and other expensive items.   However, after

providing their personal information, consumers were not simply provided with a "free" gift, as promised.  For example, in order to get a "free" plasma television, a consumer was required to subscribe to as many as a dozen advertising partners in about 20 steps or web pages that required the user to provide more information at every step.  These mandatory purchases often included magazine subscriptions or credit card applications that required the user to accept and even use the credit card within a certain time period.

45.    It was regular practice in the Webclients division to require a consumer to make one or more purchases from its advertisers in order to procure the "free" gift.  This applied to both email solicitations with "free" gift offers in the subject line and website ads that offered the "free" product.

46.    For example, ValueClick launched an advertising campaign for Applebees and offered a "free" $500 gift certificate.  This advertisement required consumers to provide their personal information, go through many steps and make multiple purchases before qualifying for the $500 gift certificate.

47.    In another example, ValueClick offered a "free" $25 Home Depot gift card that was also tied to a sweepstakes.  After enduring an exhaustive process, at the last page, a consumer had to accept at least two of the six offers in order to receive the $25 gift card.  The basic idea is that the value of the "free" gift is not worth going through the exhaustive process or what the consumer had to spend to get it.  Therefore, the Individual Defendants would be able to get the lead without giving any "free" gifts.

48.    These unlawful marketing practices were common knowledge within the Company.

49.    Furthermore, the Individual Defendants caused ValueClick to sell the same lead generated by one free product campaign to several advertisers for completely different products.  Defendants Gray's "claim to fame" was taking a 30 cent lead and turning it into $2.00 or more.  Defendants Gray and Piotroski were

consistently warned that ValueClick's revenues would eventually drop because the Company was selling the same leads to the same customers.

50.     In order to conceal their misconduct from customers and the public, the Individual Defendants would set up a shell corporation in Delaware or Nevada for each of its "free" gift and sweepstakes websites. Each website was operated under the shell corporation in order to shield ValueClick and Webclients' involvement in the scam. It would be difficult for anyone to trace it back to the Company.

51.     These bogus advertising campaigns were never launched without the approval of defendants Gray, Piotroski and Zarley, to whom they reported. As such, these defendants knowingly and deliberately engaged in the improper misconduct described above.

**52.**     Furthermore, because these practices were common knowledge within the Company, the Board (defendants Zarley, Buzby, Hart, Rayport and Vadnais) knew of these illegal marketing and advertising practices.

**53.**     **The Individual Defendants' False and Misleading Statements**

54.     The Individual Defendants, with knowledge of the illegal and deceptive practices of the Webclients division, made false and misleading representations about ValueClick's business performance, stating that, quarter after quarter, the Company's financial results had exceeded expectations and that the guidance for the fiscal year would be raised.   They failed to disclose to ValueClick and its shareholders that the Company's outstanding financial performance and continual improvements were due mostly to the deceptive marketing practices perpetuated by the Individual Defendants. Furthermore, the Individual Defendants knew that their misconduct was illegal and unsustainable.

55.     Specifically, each of the Individual Defendants knew, but did not disclose to the market, that:

a.     ValueClick's lead-generation practices violated the Federal Trade Commission Act and the CAN-SPAM Act;

b.   ValueClick's advertising campaigns that promised consumers a "free" gift of substantial value but required one or more purchases of the advertised product violated FTC guidelines;

c.   ValueClick's use of long surveys to generate e-mail addresses for resale violated industry standards;

d.   In violation of applicable laws, ValueClick did not honor consumers' requests to opt-out of advertisement campaigns, did not establish any procedure under which consumers can opt-out and instead continued to send solicitation to them;

e.   In violation of applicable laws, ValueClick offered users entry into contests for prizes that were actually never awarded;

f.   ValueClick made false and misleading representations regarding its lead-generation capabilities to investors, shareholders, industry analysts and customers;

g.   ValueClick lacked adequate internal and financial controls;

h.   ValueClick's illegal and deceptive trade practices were unsustainable and would eventually be discovered;

i.   When the Company's continuing deceptive trade practices were disclosed, the price of ValueClick common stock would fall significantly.

56.   As such, the following statements regarding the Company's financial performance and lead generation business, as known by the Individual Defendants, were false and misleading when made.

57.   On November 1, 2006, ValueClick issued a press release announcing its third quarter 2006 earnings, entitled "ValueClick Announces Third Quarter 2006 Results; *Results Exceed Previously Issued Guidance; 2006 Guidance Increased*." The Company announced:

ValueClick, Inc. (Nasdaq:VCLK) today reported financial results for the third quarter ended September 30, 2006. Revenue, adjusted-EBITDA(1) and diluted net income per common share for the quarter *exceeded previously issued guidance*. Based on its third quarter performance and outlook for the fourth quarter, *ValueClick increased its guidance for fiscal year 2006*.

"Our core businesses delivered another strong quarter, as our expertise in monetizing online traffic drove 37 percent year-over-year organic revenue growth and financial performance that exceeded all of our guidance metrics," said James Zarley, chairman and chief executive officer of ValueClick. "Our large-scale network solutions enable our advertiser and publisher clients to benefit from the continued

fragmentation of online media consumption, and our increased 2006 guidance illustrates our confidence in finishing 2006 on a strong note."

Revenue for the third quarter of 2006 was a record $137.9 million, well above the high-end of the Company's previously issued guidance and a 69 percent increase from the third quarter of 2005. Third quarter 2006 results include a full quarter of operations from Fastclick, acquired on September 29, 2005.

Income before income taxes for the third quarter of 2006 was $26.4 million, compared to $18.5 million for the third quarter of 2005 . . . .

Adjusted-EBITDA for the third quarter of 2006 was $35.6 million, above the high-end of the Company's previously issued guidance and an increase of 57 percent from the third quarter of 2005.

Net income for the third quarter of 2006 was $16.8 million, or $0.17 per diluted common share, compared to $11.0 million, or $0.13 per diluted common share, for the third quarter of 2005. Third quarter 2006 diluted net income per common share exceeded the Company's previously issued guidance of $0.14 . . . .

(emphasis added).

58.     In the November 1, 2006 press release, ValueClick also ***raised its guidance ranges for fiscal year 2006*** from that previously issued on August 1, 2006, as shown below:

| Fiscal Year 2006 | Previous Guidance | Updated Guidance |
|---|---|---|
| Revenue | $519-$529 million | $531-$533 million |
| Adjusted-EBITDA | $133-$137 million | $137-$139 million |
| Diluted net income per common share | $0.48-$0.54 | $0.57-$0.58 |

59.     Additionally, ValueClick announced guidance for the fourth quarter of 2006:

| Fourth Quarter 2006 | Guidance |
|---|---|
| Revenue | $146-$148 million |
| Adjusted-EBITDA | $38-$40 million |
| Diluted net income per common share | $0.17-$0.18 |

60.     On February 21, 2007, ValueClick issued a press release announcing its fourth quarter 2006 earnings, entitled "ValueClick Announces Record Results for Fourth Quarter 2006; ***Results Exceed Previously Issued Guidance***; Company Provides Initial 2007 Guidance" and stated:

ValueClick, Inc. (Nasdaq:VCLK) today reported financial results for the fourth quarter and fiscal year ended December 31, 2006. Revenue, adjusted-EBITDA(1) and diluted net income per common share for the quarter *exceeded previously issued guidance*.

"The successful integration of our 2005 acquisitions helped us generate another year of strong performance in 2006, including a fourth quarter with 38 percent year-over-year revenue growth and record revenue, net income and adjusted-EBITDA," said James Zarley, chairman and chief executive officer of ValueClick. "The leadership positions we have built in performance-based marketing solutions and value-added online networks give us confidence to anticipate continued strong growth and healthy margins in 2007."

* * *

Revenue for the fourth quarter of 2006 was a record $160.4 million, above the high end of the Company's previously issued guidance and an increase of $43.8 million, or 38 percent, from $116.6 million for the fourth quarter of 2005. Fourth quarter 2006 results include one month of operations from Shopping.net, acquired in December 2006, which was immaterial.

Income before income taxes for the fourth quarter of 2006 was a record $38.5 million compared to $24.7 million for the fourth quarter of 2005. Adjusted-EBITDA for the fourth quarter of 2006 was a record $46.1 million, above the high end of the Company's previously issued guidance and an increase of $12.4 million, or 37 percent, from $33.7 million for the fourth quarter of 2005.

Net income for the fourth quarter of 2006 was $22.1 million, or $0.22 per diluted common share, compared to $14.2 million, or $0.14 per diluted common share, for the fourth quarter of 2005. Fourth quarter 2006 diluted net income per common share exceeded the high end of the Company's previously issued guidance range by $0.04.

For the fiscal year ended December 31, 2006, ValueClick reported revenue of $545.6 million, an increase of $241.6 million, or 79 percent, from revenue of $304.0 million for fiscal year 2005. Assuming acquisitions in 2005 and 2006 had been completed on January 1, 2005, year-over-year organic revenue growth was 34 percent for fiscal year 2006(2).

Fiscal year 2006 income before taxes was $110.1 million compared to $69.5 million for fiscal year 2005. Fiscal year 2006 adjusted-EBITDA was $145.1 million compared to $85.6 million for fiscal year 2005. Net income for fiscal year 2006 was $63.1 million, or $0.62 per diluted common share, compared to $40.6 million, or $0.45 per diluted common share, for fiscal year 2005 . . . .

(emphasis added).

61.     In the February 21, 2007 press release, ValueClick also provided its guidance for initial fiscal year 2007 and first quarter of 2007, as shown below:

| Fiscal Year 2007 | Guidance |
|---|---|
| Revenue | $645-$665 million |
| Adjusted-EBITDA | $175-$180 million |
| Diluted net income per common share | $0.78-$0.80 |

| First Quarter 2007 | Guidance |
|---|---|
| Revenue | $148-$149 million |
| Adjusted-EBITDA | $38-$39 million |
| Diluted net income per common share | $0.17 |

62.     On March 1, 2007, ValueClick filed a Form 10-K with the SEC signed by defendants Zarley, Ray, Buzby, Hart, Rayport and Vadnais, providing its financial results for fiscal year 2006 and also describing its business:

*Lead Generation Marketing*

Our lead generation capabilities have been developed organically and through acquisitions, including the acquisitions of HiSpeed Media in December 2003 and Webclients in June 2005. We believe we are one of the largest providers of lead generation marketing services.

In our lead generation marketing services, through our proprietary technology platforms, we manage online campaigns that generate qualified customer inquiries for an advertiser's product or service. An online consumer generates a qualified customer inquiry when he or she responds to the advertiser's offer by providing some personal information (such as their email address, phone number and/or mailing address) and requesting to be contacted by the advertiser. Lead generation advertiser customers only pay us when an online consumer opts in to being contacted by the advertiser.

We utilize a number of methods to distribute advertiser lead generation offers, including:

- Opt-in email lists—where online visitors have agreed to receive advertiser offers through email messages;

- Co-registration—where online parties visiting or registering to use a publisher's website are also invited to register for advertisers' offers;

- Display ads—where publisher partners agree to display online ads focused on generating customer leads for specific offers; and

- ValueClick owned and operated websites—where we manage websites that host advertiser offers from which visitors can choose. ValueClick lead generation websites include survey websites, gift card and prize-related websites, and vertical industry category websites such as online continuing education and financial services.

63.     The Individual Defendants, who comprise virtually the entire executive corps of the Company and the majority of its Board, knew of ValueClick's illegal marketing practices, which were discussed formally and informally during ValueClick Board and committee meetings, management meetings, and other meetings attended by the Individual Defendants.  Indeed, the Individual Defendants were keenly aware that the Company was engaging in illegal and deceptive practices, which resulted in the FTC investigation described above.

64.     On May 2, 2007, ValueClick issued a press release announcing its first quarter 2007 earnings, entitled "ValueClick Announces First Quarter 2007 Results; Results Exceed Previously Issued Guidance; *Company Raises 2007 Outlook*" and announced:

> ValueClick, Inc. (Nasdaq: VCLK) today reported financial results for the first quarter ended March 31, 2007. Revenue, adjusted-EBITDA(1) and diluted net income per common share for the quarter exceeded previously issued guidance.

> "The first quarter was a great start to 2007 for ValueClick, with 34 percent revenue growth and all segments performing above plan," said James Zarley, chairman and chief executive officer of ValueClick. "We continue to differentiate ourselves through a unique combination of technology, process, relationships, and our constant focus on industry best practices. The fundamentals of our businesses are strong, and I am confident in our ability to deliver strong growth and profitability in 2007."

> Revenue for the first quarter of 2007 was $156.9 million, above the high end of the Company's previously issued guidance and an increase of $39.6 million, or 34 percent, from $117.3 million for the first quarter of 2006. First quarter 2007 results include three months of operations from Shopping.net, acquired in December 2006. Year-over-year pro-forma organic revenue growth was 33 percent in the first quarter of 2007.

> Income before income taxes for the first quarter of 2007 was $32.1 million compared to $18.1 million for the first quarter of 2006. Adjusted-EBITDA for the first quarter of 2007 was $41.0 million, above the high end of the Company's previously issued guidance and an increase of $13.7 million, or 50 percent, from $27.4 million for the first quarter of 2006.

> Net income for the first quarter of 2007 was $18.6 million, or $0.18 per diluted common share, compared to $9.8 million, or $0.09 per diluted common share, for the first quarter of 2006. First quarter 2007 diluted net income per common share exceeded the Company's previously issued guidance by $0.01.

(emphasis added).

65.     In the May 2, 2007 press release, ValueClick *raised its fiscal year 2007 guidance ranges*, issued previously on February 21, 2007, based on its first quarter results and outlook for 2007:

| Fiscal Year 2007 | Previous Guidance | Updated Guidance |
|---|---|---|
| Revenue | $645-$665 million | $655-$665 million |
| Adjusted-EBITDA | $175-$180 million | $177-$182 million |
| Diluted net income per common share | $0.78-$0.80 | $0.79-$0.81 |

66.     Additionally, ValueClick announced guidance for the second quarter of 2007:

| Fourth Quarter 2006 | Guidance |
|---|---|
| Revenue | $157-$159 million |
| Adjusted-EBITDA | $40-$42 million |
| Diluted net income per common share | $0.17-$0.18 |

### Revelation of the Individual Defendants' Misconduct

67.     In a Form 8-K filed with the SEC on May 18, 2007, the Company disclosed that "[o]n May 16, 2007, ValueClick received a letter from FTC stating that the FTC is conducting an inquiry to determine whether the Company's lead generation activities violated either the Federal Trade Commission Act or the CAN-SPAM Act.   Specifically, the FTC is investigating certain ValueClick websites which promise consumers a free gift of substantial value, and the manner in which the Company drives traffic to such websites, in particular through email."

68.     Subsequently, in a Form 8-K filed with the SEC on May 22, 2007, the Company disclosed that "as a result of the Form 8-K filed on May 18, 2007, the Company received several calls from analysts regarding the revenue contribution of its lead generation business in general, and its promotion-based sub-category of lead generation in particular, to its Media segment. In response, ValueClick stated that lead generation accounted for more than 60 percent of its Media segment revenue for

the quarter ended March 31, 2007.   In addition, the Company stated that the promotion-based sub-category of lead generation, which is the subject of the FTC inquiry, accounted for less than 30 percent of its Media segment revenue for the quarter ended March 31, 2007."

69.   On May 30, 2007, the Company issued a press release announcing the resignation of Zarley as Chief Executive Officer:

> ValueClick, Inc. (Nasdaq:VCLK) today announced that its board of directors has elected Tom A. Vadnais as the Company's new chief executive officer. Mr. Vadnais has been a member of the Company's board of directors since October 2001 and has also held a number of senior management roles within ValueClick during this time, including his most recent role as president of U.S. operations.

> Mr. Vadnais succeeds James R. Zarley, who has served as ValueClick's chief executive officer since 1999. Mr. Zarley will remain a full-time ValueClick employee and will continue to play an active role in the Company. Mr. Zarley has been named ValueClick's executive chairman of the board of directors, focusing primarily on the Company's strategic direction and the gradual management transition of the Company's operations.

70.   On July 30, 2007, ValueClick issued a press release announcing its second quarter 2007 earnings, **which was below expectations**:

> ValueClick, Inc. (Nasdaq:VCLK) today reported financial results for the second quarter ended June 30, 2007. Diluted net income per common share of $0.17 **met the low end of the Company's previously-issued guidance**. However, revenue and adjusted-EBITDA(1) **were below the Company's previously-issued guidance.** The quarter's results were negatively impacted by the Company's promotion-based business.

> \* \* \*

> "The promotion-based sector suffered a downturn that began in late May and became more pronounced in June, which negatively impacted our quarter," said Tom Vadnais, chief executive officer of ValueClick. "We have reassessed our outlook on the promotion-based business and have taken aggressive steps to bring its costs in line with the changes occurring in this part of the industry. We expect to see the full impact of this cost-cutting initiative in the fourth quarter."

> Mr. Vadnais continued, "While promotion-based lead generation results were disappointing, I am pleased by the strong performance in our non-promotional Media, Affiliate Marketing and Technology businesses. Additionally, MeziMedia gives our Comparison Shopping segment scale in the U.S. that complements PriceRunner's scale in Europe. ValueClick's scale and breadth in online performance marketing

services and technologies differentiate us from our peers, and we remain optimistic about the Company's prospects for growth and profitability."

Second Quarter 2007 Results

Revenue for the second quarter of 2007 was $148.7 million, an increase of $18.6 million, or 14 percent, from $130.0 million for the second quarter of 2006. Second quarter 2007 results include three months of operations from Shopping.net, acquired in December 2006.

Income before income taxes for the second quarter of 2007 was $29.4 million compared to $27.2 million for the second quarter of 2006. Adjusted-EBITDA for the second quarter of 2007 was $38.8 million compared to $36.0 million for the second quarter of 2006. Second quarter 2006 income before income taxes and adjusted-EBITDA include net proceeds of $1.9 million related to a favorable legal settlement.

Net income for the second quarter of 2007 was $17.6 million, or $0.17 per diluted common share, compared to $14.4 million, or $0.14 per diluted common share, for the second quarter of 2006.

The consolidated balance sheet as of June 30, 2007 includes $373 million in cash, cash equivalents and marketable securities, $703 million in total stockholders' equity and no long-term debt.

(emphasis added).

71.     Also, in the July 30, 2007 press release, ValueClick *lowered its fiscal year 2007 guidance ranges*, issued previously on May 2, 2007:

| Fiscal Year 2007 | Previous Guidance | Updated Guidance |
|---|---|---|
| Revenue | $655-$665 million | $645-$660 million |
| Adjusted-EBITDA | $177-$182 million | $168-$172 million |
| Diluted net income per common share | $0.79-$0.81 | $0.74-$0.76 |

72.     Additionally, ValueClick announced guidance for the third quarter of 2007:

| Fourth Quarter 2006 | Guidance |
|---|---|
| Revenue | $155-$165 million |
| Adjusted-EBITDA | $38-$40 million |
| Diluted net income per common share | $0.16-$0.17 |

73.     On October 16, 2007, the Company issued a press release announcing preliminary third quarter 2007 results and updated full year 2007 guidance, both of which were *below previous guidance*:

ValueClick, Inc. (Nasdaq: VCLK) today announced that, based on preliminary financial results, revenue for the third quarter ended September 30, 2007 will be *approximately $156 to $157 million compared to the Company's prior guidance range of $155 to $165 million*. Revenue was negatively impacted primarily by continued weakness in lead generation, which is included in the Media business segment, partially offset by better than expected results in the Comparison Shopping segment.

In addition, ValueClick expects that third quarter 2007 adjusted-EBITDA1 will be at or above the mid-point of the Company's prior guidance range of $38 to $40 million, and expects that diluted net income per common share will be within the Company's prior guidance range of $0.16 to $0.17.

Based on preliminary third quarter 2007 results and its current outlook for the fourth quarter, ValueClick currently anticipates that fiscal year 2007 revenue will be in *the range of $635 to $640 million compared to the Company's prior guidance range of $645 to $660 million*. Management believes that the Company's lead generation business has stabilized, and its revised outlook is based on lead generation revenue of approximately $48 to $49 million in the fourth quarter. Fiscal year 2007 adjusted-EBITDA margin is now anticipated to be in the range of 25 to 26 percent compared to the Company's prior guidance of 26 percent . . . .

(emphasis added).

74.     As known by the Individual Defendants, their illicit and deceptive marketing practices were unsustainable.   As the truth slowly emerged that ValueClick's profits and growth were inflated by misleading marketing ploys, ValueClick's customers began to inquire about the FTC investigation and its compliance with the applicable laws.   As a result of the Individual Defendants' misconduct, the Company lost a huge number of customers, and, as expected, ValueClick's revenues dropped substantially.

**The Individual Defendants' Insider Selling**

75.     From November 2006 to October 2007, defendants Barlow, Buzby, Hart, Paisley, Ray, Vadnais, White, Wolfort and Zarley, based on their knowledge of material non-public information regarding the Company's improper lead generation business and unlawful marketing and advertising practices, sold approximately 1,525,354 shares of ValueClick common stock at an average selling price of about $23.23, garnering total proceeds of *$35,446,592.39*, as follows:

| Name | Transaction Date | Number of Shares Sold | Stock Price | Total Proceeds |
|---|---|---|---|---|
| Barlow | 11/06/06 | 6,000 | $21.12 | $126,739.80 |
| | 12/13/06 | 6,250 | $24.82 | $155,125.00 |
| | 02/26/07 | 5,000 | $28.41 | $142,050.00 |
| | 02/26/07 | 7,000 | $28.41 | $198,870.00 |
| | 08/13/07 | 29,500 | $20.72 | $611,458.30 |
| Buzby | 12/15/06 | 87,700 | $24.5 | $2,148,650.00 |
| | 12/15/06 | 112,875 | $24.30 | $2,743,641.34 |
| | 03/08/07 | 1,425 | $26.68 | $38,019.00 |
| | 03/08/07 | 4,600 | $26.65 | $122,590.00 |
| Hart | 11/06/06 | 65,000 | $21.05 | $1,368,250.00 |
| | 02/26/07 | 120,000 | $28.03 | $3,363,768.00 |

| | | | | |
|---|---|---|---|---|
| Paisley | 11/06/06 | 100,000 | $21.14 | $2,114,590.00 |
| | 11/06/06 | 300,000 | $21.22 | $6,368,820.00 |
| Ray | 11/06/06 | 81,000 | $21.17 | $1,714,770.00 |
| | 11/17/06 | 51,379 | $21.88 | $1,124,563.00 |
| Vadnais | 12/14/06 | 30,000 | $25.26 | $757,920.00 |
| White | 11/08/06 | 44,375 | $21.80 | $967,375.00 |
| | 05/09/07 | 67,000 | $27.26 | $1,826,929.20 |
| Wolfort | 11/13/06 | 120,000 | $21.76 | $2,611,200.00 |
| | 11/14/06 | 30,000 | $21.50 | $645,000.00 |
| Zarley | 11/30/06 | 100,000 | $24.75 | $2,475,670.00 |
| | 11/30/06 | 156,250 | $24.45 | $3,820,593.75 |
| | **11/06/06 to 8/13/07** | **1,525,354** | **$23.23** | **$35,446,592.39** |

76.    The stock sales described above were not part of any normal or regular pattern or practice of such sales by defendants Barlow, Buzby, Hart, Paisley, Ray, Vadnais, White, Wolfort and Zarley, but rather were unusual in that:

> a.    All of these defendants' stock sales occurred during the same time period;
>
> b.    All of these defendants' stock sales occurred soon after the Company's positive earnings releases, which contained false and misleading statements;
>
> c.    The stock sales represented sales of 100% of Barlow, Buzby, Hart, Paisley, Ray, White, Wolfort and Zarley's ValueClick stockholdings and 27% of Vadnais's ValueClick stockholdings.

77.    As defendants Barlow, Buzby, Hart, Paisley, Ray, Vadnais, White, Wolfort and Zarley expected, the negative earnings announcement for the second quarter and third quarter of 2007, which announced a "downturn" in the Company's promotion-based business that was being investigated by the FTC, had an immediate material effect on the price of ValueClick common stock.  On July 30, 2007, the day of the second quarter 2007 earnings announcement, ValueClick's stock plummeted 23%, from $26.01 to a low of $21.01, and on October 16, 2007, the day of the third quarter 2007 earnings announcement, ValueClick's stock plummeted 11.6%, from $27.78 on the previous day to a low of $24.55.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

78.    Plaintiff brings this action derivatively in the right and for the benefit of ValueClick to redress breaches of fiduciary duty by and unjust enrichment of the Individual Defendants.

79.    Plaintiff will adequately and fairly represent the interests of ValueClick and its shareholders in enforcing and prosecuting its rights.

80.    Plaintiff is an owner of ValueClick common stock and was an owner of ValueClick common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

81.    As a result of the facts set forth herein, Plaintiff has not made any demand on the ValueClick Board of Directors to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

82.    At the time this action was commenced, the Board consists of seven directors, defendants Zarley, Buzby, Hart, Rayport and Vadnais and directors James A. Crouthamel and James R. Peters.  A majority of the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

a.    In light of their knowledge of the Company's ongoing deceptive trade and marketing practices, defendants Zarley, Buzby, Hart, Rayport and Vadnais each face a substantial likelihood of being held liable for breaching their fiduciary duties, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

b.    Defendants Zarley, Buzby, Hart and Vadnais each face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith and violating California Corporations Code § 25402 by engaging in illegal insider trading of ValueClick securities as alleged herein, and therefore they are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

c.    Defendants Buzby and Hart, as Audit Committee members, knowingly approved the filing of false and misleading financial statements and therefore each face a substantial likelihood of being held liable for breaching their fiduciary duties.

1  Accordingly, defendants Buzby and Hart are incapable of disinterestedly and independently considering a demand to
2  commence and vigorously prosecute this action;

3  d.  Defendants Buzby, Hart and Rayport comprise the Compensation Committee of the Board, with Hart serving as Chairman of the
4  Compensation Committee. According to the Company's proxy statement filed with the SEC on April 19, 2007, the
5  Compensation Committee "reviews and approves the compensation and incentive arrangements for the Company's
6  Chief Executive Officer." Accordingly, defendant Vadnais (Chief Executive Officer of the Company) is incapable of
7  disinterestedly and independently considering a demand to commence and vigorously prosecute this action against
8  defendants Buzby, Hart and Rayport, who control his compensation as Chief Executive Officer of the Company;

9
10  e.  Zarley and Buzby share a longstanding personal and professional relationship especially with respect to their work at Best Internet. From December 1996 to May 1998, Zarley was Chairman and
11  Chief Executive Officer of Best Internet, and Buzby was a founding investor of Best Internet and held various positions,
12  including Chief Financial Officer and Vice Chairman, from August 1994 to January 1999. Accordingly, Zarley and Buzby
13  are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action
14  against each other;

15  f.  Zarley and Hart share a longstanding personal and professional relationship as they are both directors of Texas Roadhouse, Inc.
16  Accordingly, Zarley and Hart are incapable of independently and disinterestedly considering a demand to commence and
17  vigorously prosecute this action against each other;

18  g.  Buzby shares a longstanding personal and professional relationship with defendant Ray with respect to their work at
19  Internet Barter, Inc. Buzby was Chief Operating Officer from June 1999 to September 2000 and was a founding investor of
20  Internet Barter, Inc., while Ray served as Chief Financial Officer of the company prior to joining ValueClick in November 2002.
21  Accordingly, Buzby is incapable of independently and disinterestedly considering a demand to commence and
22  vigorously prosecute this action against defendant Ray; and

23  h.  Vadnais shares a longstanding personal and professional relationship with defendants Barlow and Ray with respect to their
24  work at Mediaplex, where Vadnais served as president, Chief Executive Officer and a member of the board of directors, Barlow
25  served as general counsel and secretary, and Ray served as general manager. Accordingly, Vadnais is incapable of
26  independently and disinterestedly considering a demand to commence and vigorously prosecute this action against
27  defendants Barlow and Ray.

28

## COUNT I

### AGAINST ALL INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH

83.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

84.     As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

85.     The Individual Defendants knowingly implemented and engaged in the Company's improper business practices, breaching their fiduciary duties.

86.     Furthermore, despite their actual knowledge of the Company's improper business practices, the Individual Defendants made no effort to correct the problems or prevent their recurrence; thus, they abdicated their fiduciary duty of good faith.

87.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, costs and expenses incurred in connection with the FTC investigation.

## COUNT II

### AGAINST DEFENDANTS BARLOW, BUZBY, HART, PAISLEY, RAY, VADNAIS, WHITE, WOLFORT AND ZARLEY FOR BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH

88.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

89.     At the time of each of the stock sales set forth herein, defendants Barlow, Buzby, Hart, Paisley, Ray, Vadnais, White, Wolfort and Zarley knew, but

1   did not disclose publicly, the material information regarding their illicit and

2   deceptive business practices described herein.

3       90.    Each of these defendants sold ValueClick common stock on the basis of

4   and because of their knowledge of this material non-public information.

5       91.    At the time of their stock sales, defendants Barlow, Buzby, Hart,

6   Paisley, Ray, Vadnais, White, Wolfort and Zarley knew that when the material

7   information regarding their improper practices at ValueClick were publicly

8   disclosed, the price of the Company's common stock would dramatically decrease.

9   Defendants Barlow, Buzby, Hart, Paisley, Ray, Vadnais, White, Wolfort and

10  Zarley's sales of ValueClick common stock based on their knowledge of this

11  material non-public information were a breach of their fiduciary duties of loyalty and

12  good faith.

13      92.    Since the use of the Company's proprietary information for their own

14  gain constitutes a breach of their fiduciary duties, the Company is entitled to the

15  imposition of a constructive trust on any proceeds defendants Barlow, Buzby, Hart,

16  Paisley, Ray, Vadnais, White, Wolfort and Zarley thereby obtained.

17  

## COUNT III

**AGAINST DEFENDANTS BARLOW, BUZBY, HART, PAISLEY, RAY, VADNAIS, WHITE, WOLFORT AND ZARLEY FOR UNJUST ENRICHMENT**

18
19
20      93.    Plaintiff incorporates by reference all preceding and subsequent

21  paragraphs as if fully set forth herein.

22      94.    Defendants Barlow, Buzby, Hart, Paisley, Ray, Vadnais, White, Wolfort

23  and Zarley were unjustly enriched by their receipt of proceeds from their illegal sales

24  of ValueClick common stock, as alleged herein, and it would be unconscionable to

25  allow them to retain the benefits of their illegal conduct.

26      95.    To remedy their unjust enrichment, the Court should order them to

27  disgorge to the Company all proceeds derived from their illegal sales of ValueClick

28  common stock.

## COUNT IV

### AGAINST DEFENDANTS BARLOW, BUZBY, HART, PAISLEY, RAY, VADNAIS, WHITE, WOLFORT AND ZARLEY FOR VIOLATION OF CALIFORNIA CORPORATION CODE § 25402

96.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

97.    At the time that Defendants Barlow, Buzby, Hart, Paisley, Ray, Vadnais, White, Wolfort and Zarley sold their shares of the Company's common stock in California as set forth herein, by reason of their high executive and/or directorial positions with the Company, Defendants Barlow, Buzby, Hart, Paisley, Ray, Vadnais, White, Wolfort and Zarley had access to highly material information regarding the Company, including the information set forth herein regarding their illicit and deceptive business practices perpetrated at ValueClick.

98.    At the time of such sales, that information was not generally available to the public or the securities markets. Had such information been generally available, it would have significantly reduced the market price of the Company's shares at that time.

99.    Defendants Barlow, Buzby, Hart, Paisley, Ray, Vadnais, White, Wolfort and Zarley, and each of them, had actual knowledge of material, adverse non-public information regarding the Company, and thus sold their shares of the Company's common stock in California in violation of California Corporations Code § 25402.

100.    Pursuant to California Corporations Code § 25502.5, Defendants Barlow, Buzby, Hart, Paisley, Ray, Vadnais, White, Wolfort and Zarley, and each of them, are liable to the Company for damages in an amount up to three times the difference between the price at which the stock was sold by these defendants, and each of them, and the market value which the stock would have had at the time of the sale if the information known to these defendants had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of law;

B.   Imposing a constructive trust in favor of the Company for the amount of proceeds defendants Barlow, Buzby, Hart, Paisley, Ray, Vadnais, White, Wolfort and Zarley received from their sales of ValueClick common stock alleged herein;

C.   Ordering defendants Barlow, Buzby, Hart, Paisley, Ray, Vadnais, White, Wolfort and Zarley to disgorge to the Company all proceeds derived from their sales of ValueClick common stock alleged herein;

D.   Awarding the Company treble damages against defendants Barlow, Buzby, Hart, Paisley, Ray, Vadnais, White, Wolfort and Zarley as provided by California Corporations Code § 25502.5;

E.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: February 5, 2008

Respectfully submitted,

ROSMAN & GERMAIN LLP

Daniel L. Germain
16311 Ventura Boulevard
Suite 1200
Encino, CA 91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP
Eric L. Zagar
Nichole Browning
Tara P. Kao
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

VERIFIED FIRST AMENDED DERIVATIVE COMPLAINT
CASE NO. 07-07141 DDP (AJWx)

- 30 -

**VERIFICATION**

I, Susan Lacerenza, hereby verify that I have authorized the filing of the attached Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.   I declare under penalty of perjury that the foregoing is true and correct.

DATE: 1/31/08

SUSAN LACERENZA

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am a member of the State Bar of California. I am over the age of 18 and not a party to the within action; my business address is 16311 Ventura Boulevard, Suite 1200, Encino, California 91436-2152.

On February 5, 2008, I served the foregoing document described as **VERIFIED FIRST AMENDED DERIVATIVE COMPLAINT** on the interested parties in this action

[x]  by placing true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list.

[x]  **(BY MAIL)** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in this affidavit.

[ ]  **(BY PERSONAL SERVICE)** I delivered such envelope by hand to the office of the addressee shown on the service list.

[ ]  **(BY FACSIMILE)** I caused the foregoing document to be served by facsimile transmission from facsimile machine number (818) 788-0885 to each interested party at the facsimile machine number shown on the service list. Each transmission was reported as complete and without error. A transmission report was properly issued by the sending facsimile machine for each interested party served.

[ ]  **(BY OVERNIGHT COURIER)** I caused the foregoing documents to be served by Federal Express Standard Overnight Delivery by depositing said documents in a box or other facility regularly maintained by the express service carrier, or delivered to an authorized courier or driver authorized by the express service carrier to receive documents, in an envelope or package designated by the express service carrier with delivery fees paid or provided for addressed to the addressee shown on the service list.

[x]  **(FEDERAL)** I declare that I am a member of the State Bar of California.

Executed on February 5, 2008 at Los Angeles, California.

Daniel L. Germain

**PROOF OF SERVICE**

Susan LaCerenza v. James R. Zarley (In re: ValueClick, Inc. Derivative Litigation)
Case No CV-07-07141 R (PJWx)

Eric L. Zagar
Nichole Browning
Tara P. Kao
Schiffrin Barroway Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: 610-667-7706
Facsimile: (610) 667-7056
Attorneys for Plaintiffs

Kevin Rosen
David Han
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7886
Facsimile (213) 229-6886
Attorneys for Individual Defendants

Kirsten Spira
McNamara, Spira & Smith
10866 Wilshire Boulevard, Suite 800
Los Angeles, California 90024
Telephone: (310) 979-2585
Facsimile: (310) 979-2581
Attorneys for Nominal Defendant ValueClick, Inc.